KATHRYN C. ASHTON, State Bar No. 193579
kathryn.ashton@clydeco.us
W. ANDREW MILLER, State Bar No. 104712
andy.miller@clydeco.us
**CLYDE & CO US LLP**
101 Second Street, 24th Floor
San Francisco, California 94105
Telephone: (415) 365-9800
Facsimile: (415) 365-9801

DOUGLAS M. MANGEL
doug.mangel@clydeco.us
GABRIELA RICHEIMER
gaby.richeimer@clydeco.us
*(Pro Hac Vice Applications to be Submitted)*
**CLYDE & CO US LLP**
1775 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 747-5100
Facsimile:  (202) 747-5150

Attorneys for Plaintiff
Twin City Fire Insurance Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWIN CITY FIRE INSURANCE COMPANY, an Indiana corporation,<br><br>Plaintiff,<br><br>-vs-<br><br>SLRA Inc., a California corporation, and SCOTT M. LANDRESS, an individual,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT and REIMBURSEMENT OF DEFENSE COSTS (28. U.S.C. §§ 2201 and 28 U.S.C § 1332)** |

## NATURE OF THE ACTION

1.    Twin City Fire Insurance Company ("Twin City") brings this action to determine the availability of insurance coverage under an excess management liability policy (the "Twin City Policy") following the institution of administrative proceedings and the entry of a final, unappealable "cease-and-desist order" against Twin City's insureds, Scott M. Landress and SLRA Inc. as successor to Liquid Realty Advisors III, LLC ("SLRA" and collectively with Landress, the

"Insureds").  As reflected in the order, the United States Securities and Exchange Commission ("SEC") accepted Offers of Settlement from the Insureds and found that they had breached fiduciary duties owed to two private equity fund clients and had "willfully" violated several statutory provisions prohibiting fraud or deceit.  A true and correct copy of the SEC's February 7, 2017 Cease-and-Desist Order (the "SEC Order") is attached as Exhibit A.

2. The Twin City Policy excludes from coverage any "Loss" (a term defined to include Defense Costs) in connection with any Claim based upon or arising out of: (1) the gaining of any profit, remuneration or advantage to which the Insured was not legally entitled (the "Profit Exclusion"), or (2) the committing of any deliberate fraudulent act by the Insured (the "Fraud Exclusion"), as determined by a final adjudication in the underlying action or in a separate action or proceeding.

3. The SEC Order is such a "final adjudication."  And the SEC Order—through which the agency penalized and censured the Insureds for improperly disbursing undisclosed fees from their advisory clients—"finally established" that the Defense Costs incurred toward defense of the SEC's investigation were not covered because of the Profit Exclusion and Fraud Exclusion.  As such, Twin City has demanded repayment of approximately $2.5 million expended to defend the Insureds in connection with the SEC's investigation preceding the SEC Order.  To date, the Insureds have refused to repay Twin City for the Defense Costs it advanced, despite their obligation to do so.  Accordingly, Twin City seeks through this action declaratory judgment that the factual findings and conclusions in the SEC Order constitute a "final adjudication" triggering the Profit Exclusion and/or Fraud Exclusion in the Twin City Policy.

4. Alternatively, Twin City seeks a final declaratory judgment in this action pursuant to the Profit Exclusion and/or Fraud Exclusion that the Defense Costs incurred for the SEC investigation arose out of the Insureds' gaining of any profit, remuneration or advantage to which they were not legally entitled or out of a deliberate fraudulent act by the Insured.

5. In either event, because the Insureds received payment of Defense Costs when, in fact, the loss was not covered, Twin City is entitled to recover from the Insureds the full amount of Defense Costs expended toward the SEC's investigation plus interest accrued thereon.

## PARTIES

6. Plaintiff Twin City Fire Insurance Company is an Indiana corporation with its principal place of business in Hartford, Connecticut.

7. Defendant SLRA Inc. is a California corporation with its principal place of business presently located in Marin County, California.

8. On information and belief, SLRA is the successor entity to both Liquid Realty Advisors, LLC ("LRA") and Liquid Realty Advisors III, LLC ("LRA III") and has conducted substantial business in this judicial district including at the time period relevant to the allegations in this Complaint.

9. Scott M. Landress is an individual who, on information and belief, currently resides in Marin County, California and conducts substantial business in California.

## JURISDICTION

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 2201 and 2202.

11. There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This insurance coverage dispute presents a justiciable controversy capable of resolution by this Court.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and all defendants, on information and belief, reside in this District.

## INTRA-DISTRICT ASSIGNMENT

14. Pursuant to Civil L.R. 3-5, Twin City states that a substantial part of the events or omissions giving rise to the claim occurred in Danville, California (Contra Costa County) where, on information and belief, the Insureds were located during the time period relevant to this dispute. Accordingly, assignment to the Oakland/San Francisco Division is proper pursuant to Civil L.R. 3-2(c) and (d).

//

-3-
**COMPLAINT FOR DECLARATORY JUDGMENT**

## FACTUAL BACKGROUND

**A. Liquid Realty Partners and "Project Ursula"**

15. This coverage dispute relates to a group of companies doing business under the name Liquid Realty Partners ("Liquid Realty"), of which Landress was a founder and principal, and a series of real estate investments called Project Ursula.

16. Liquid Realty specialized in real estate private equity secondary transactions. "Secondary" transactions in this context typically involved the purchase of pre-existing investor commitments to real estate private equity funds from the limited or general partners of those funds, or recapitalization of such funds.

17. In January 2006, Liquid Realty formed two private equity funds called Liquid Realty Partners III, L.P. and Liquid Realty Partners III-A, L.P. (collectively, "Fund III").

18. On information and belief, Liquid Realty established Fund III in order to acquire on a secondary basis a portfolio of real estate trusts with underlying investments in properties located in the United Kingdom (the "Ursula Portfolio" or "Project Ursula"). Liquid Realty arranged for Fund III to purchase 85% of the Ursula Portfolio from a European bank, while another Liquid Realty-established fund purchased the minority remainder of the Ursula Portfolio.

19. Each fund within Fund III was governed by a Limited Partnership Agreement (together, the "Partnership Agreements"), which among other things delineated the respective roles and responsibilities of general partner and limited partner.

20. Fund III's limited partners—large institutional investors such as university endowments and pension funds (collectively, the "Limited Partners")—committed approximately £400 million toward Project Ursula. This capital contribution amounted to approximately US$700 million at the time of the investments.

21. Furthermore, a subset of Limited Partners formed an "Advisory Committee" with certain rights and responsibilities under the Partnership Agreements.

22. From Fund III's formation through October 31, 2014, the General Partner for Fund III was LRGP III, LLC ("LRGP" or the "General Partner"). On information and belief, Landress owned and controlled LRGP and was its sole member.

23. On information and belief, Landress initially caused the General Partner to appoint LRA III to serve as Fund III's management company pursuant to the Partnership Agreements.

24. In December 2013, LRA III merged into LRSA, which succeeded LRA III as the Fund III management company.

25. As the appointed manager for Fund III, LRA III and then SLRA earned fees based upon the net asset value of the underlying investments (the "Management Fees"). Under the Partnership Agreements, the management company was to receive annual Management Fees equal to 1.25% of Fund III's net asset value.

26. The global financial crisis struck after Fund III began operating. That crisis proved especially difficult for leveraged real estate investments like those held in Fund III. With property values cratering, Management Fees paid under the Partnership Agreement shrank while costs to manage Fund III through the crisis grew.

27. The diminished Management Fees and increased costs resulted in the Fund III management company (then LRA III) operating at a loss beginning in 2009.

**B. Landress Withdraws £16.25 Million From Fund III To Pay Himself And SLRA**

28. In October 2009, Landress sought additional compensation from the Fund III Limited Partners for operating losses resulting from Fund III's poor performance. The Limited Partners declined to cover these shortfalls.

29. Landress made further "make whole" requests in July 2010 and November 2011. Both times, the Limited Partners declined to cover any shortfalls.

30. By year-end 2013, Fund III was winding down, and most of the Ursula Portfolio investments had been realized.

31. On January 7, 2014, Landress directed the General Partner to invoice Fund III on behalf of SLRA. The General Partner withdrew approximately £16.25 million from Fund III's accounts for deposit into SLRA's account. This withdrawal occurred without advance notice to the Limited Partners or Advisory Committee.

32. Then, on February 3, 2014, Landress and/or the General Partner advised the Limited Partners that the withdrawn funds were compensation for fees owed to SLRA for certain

"additional services" that LRA III and/or SLRA had performed for Fund III years earlier, mostly in 2006 (the "Additional Service Fees"). According to Landress, the Management Fees were intended to cover "passive" services but not the "active" investment-level services, and the General Partner retained LRA III (and then LRSA) to provide these "active" services to Fund III.

33. In March 2014, Landress caused the £16.25 million to be transferred to a personal account.

34. After receiving the February 3, 2014 letters, the Limited Partners objected to Liquid Realty paying Additional Service Fees to itself on several grounds.

35. First, the Limited Partners contended that the Partnership Agreements required the General Partner to seek approval from the Advisory Committee before retaining a related party like LRAIII/SLRA to perform any additional services on behalf of Fund III. According to the Limited Partners, the General Partner never sought or obtained approval to retain any Liquid Realty affiliate to perform any additional services.

36. Second, the Limited Partners contended that they never agreed to pay the Additional Service Fees.

37. Landress told the Limited Partners that the Additional Service Fees were incurred pursuant to an "oral agreement" entered into in 2006.

38. Landress, however, never produced anything in writing reflecting an understanding between any Liquid Realty entity and Fund III or the Limited Partners with respect to the claimed Additional Service Fees.

39. In addition, even though the claimed additional services were mostly rendered in 2006, Landress purportedly did not advise Liquid Realty's Director of Finance and Accounting about the Additional Service Fees until early fall of 2013, when Landress began to prepare to withdraw these fees.

40. Furthermore, the Additional Service Fees were not reflected on any of Fund III's quarterly financial updates or annual audited financial statements that the General Partner provided to the Fund III Limited Partners between 2006 and 2013. Nor was the purported oral agreement for a Liquid Realty affiliate to provide additional services to Fund III reflected on any

of quarterly financial updates or annual audited financial statements that the General Partner provided to the Fund III Limited Partners between 2006 and 2013.

41. On information and belief, in annual management representation letters to Fund III's, Landress confirmed that "[t]here are no transactions that have not been properly recorded in the accounting records underlying the consolidated financial statements," and that "all the related-party relationships and transactions of which the Partnership is aware, including fees, commissions, sales, purchases, loans, transfers, leasing arrangements, side agreements, and guarantees (written or oral)" and "[t]he amounts receivable from or payable to related parties" "have been appropriately identified, properly accounted for, and disclosed."

42. On information and belief, Landress and the General Partner's written communications to the Limited Partners regarding Fund III's performance, including the internal rate of return, did not discuss or account for any Service Fees.

43. On information and belief, prior to late 2013, Fund III's auditors were unaware of the claimed Service Fees.

44. On information and belief, Liquid Realty never produced to the SEC any documentation showing (1) that any Liquid Realty affiliate was hired in 2006 or thereafter to perform the services for which the Additional Service Fees were charged in February 2014, or (2) that Liquid Realty disclosed to Fund III's Limited Partners or the Advisory Committee that a related party had been retained to perform the additional services until after the £16.25 million had been withdrawn from Fund III in 2014.

45. On information and belief, no such documentary evidence exists.

**C. The Limited Partners Dispute The Additional Service Fees And Seek To Remove LRGP As General Partner, Resulting In Litigation**

46. The Limited Partners served a Notice of Removal dated June 23, 2014 on LRGP purporting to remove the General Partner both for cause and under the "no fault" provisions of the Partnership Agreements.

47. According to the Notice of Removal, the General Partner's conduct amounted to, among other things, fraud, breach of fiduciary duty and a willful, material breach of the

Partnership Agreements.

48. In August 2014, the General Partner and LRSA sued the Fund III Limited Partners in a matter captioned *LRGP III, LLC and SLRA Inc. v. CPP Investment Board Real Estate Holdings, Inc.*, et al., No. 14-cv-6937-RJS (S.D.N.Y. filed Aug. 26, 2014) (the "Removal Action"), contesting the Limited Partners' attempt to remove LRGP as General Partner under the "no fault" provisions of the Partnership Agreements. LRGP and SLRA also sought to demonstrate SLRA's entitlement to the Additional Service Fees under the Partnership Agreement.

49. The defendants to the Removal Action countered by filing a motion for preliminary injunction seeking to oust LRGP as General Partner and to prohibit the dissipation of the Additional Service Fees taken from the Funds. Before the Court could rule on the motion, LRGP and Landress agreed to freeze the amounts taken from Fund III and agreed that LRGP would withdraw voluntarily as General Partner.

50. In October 2014, the parties to the Removal Action filed a Stipulation advising this Court that the Arbitration had been dismissed and that the parties were working together cooperatively to effectuate LRGP's removal as General Partner under the "no fault" provisions of the Partnership Agreements. LRGP voluntarily withdrew as General Partner effective October 31, 2014.

51. After LRGP and SLRA filed an Amended Complaint, the defendants asserted twenty-eight counterclaims accusing LRGP and SLRA (among other things) of breaching fiduciary duties and charging excessive fees to Fund III (the "Counterclaims"). The Counterclaims sought to recover the assets withdrawn for the Additional Service Fees plus statutory interest at 9% per annum (among other unspecified damages).

52. The parties to the Removal Action dismissed the case voluntarily with prejudice in February 2016 after SLRA agreed to return $24,422,852.43 to the Limited Partners.

**D. The SEC Launches A Formal Investigation And Enters A "Cease And Desist" Order Against Landress And SLRA**

53. While the Removal Action was pending, the SEC commenced its non-public formal investigation into Liquid Realty's dealings with Fund III and the Additional Service Fees

captioned, "In the matter of SLRA, Inc. (HO-12631) (the "SEC Investigation")."

54. In July 2015, the SEC issued subpoenas to Landress, SLRA and LRGP (the "SEC Subpoenas").

55. The SEC Subpoenas generally sought documents from the recipients and, from Landress, sworn testimony regarding the Additional Service Fees that were the subject of the Removal Action.

56. The SEC Subpoenas also sought information regarding the accounting treatment for the fees charged to Fund III, investor presentations and meeting notes, business plan materials and contracts and communications by and between Landress, SLRA and/or the General Partner and their attorneys and accountants regarding Fund III.

57. The SEC Investigation continued for more than a year, with Liquid Realty producing hundreds of thousands of documents to the SEC.

58. The SEC also deposed Landress as part of the SEC Investigation.

59. On information and belief, the documents produced to the SEC in the SEC investigation did not reflect any request to or approval from the Limited Partners for the General Partner to retain any Liquid Realty-affiliated entity to incur the Additional Service Fees.

60. On information and belief, the documents produced to the SEC did not reflect any agreement between the General Partner and any Liquid Realty-affiliated entity to perform the additional services for which the Additional Service Fees were invoiced to Fund III.

61. Landress and SLRA ultimately presented Offers of Settlement to the SEC.

62. The SEC accepted the Offers of Settlement, as a result of which the SEC issued an Order Instituting Proceedings and Administrative Cease-and-Desist Proceedings Pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order in the matter captioned, "In the Matter of SLRA Inc. as successor entity to Liquid Realty Advisors III, LLC and Scott M. Landress."

63. The SEC Order recited a number of factual findings to which Landress and SLRA consented.

**COMPLAINT FOR DECLARATORY JUDGMENT**

64. On information and belief, the factual findings recited in the SEC Order, reflected in paragraphs 10 through 38 of Exhibit A, are true.

65. Based on the factual findings recited in the SEC Order, the SEC censured SLRA, permanently barred Landress from the securities industry and imposed a $1.25 million penalty on Landress, finding that "SLRA and Landress breached their fiduciary duties to the Funds by improperly withdrawing £16.25 million as Service Fees from the Funds' accounts in January 2014," and that they "never disclosed the existence of the Additional Service Fees in any communications with the Funds, the Limited Partners, or the Advisory Committee." SEC Order ¶¶ 31-33.

66. The SEC Order also made the following findings:

> "Respondents willfully violated Sections 206(1) and 206(2) of the Advisers Act, which prohibit an investment adviser from (1) employing any device, scheme, or artifice to defraud any client or prospective client, or (2) engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

*Id.* ¶ 39.

> "Respondents willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-(8) thereunder, which prohibit an investment adviser to a pooled investment vehicle from making an untrue statement of a material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or otherwise engaging in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."

*Id.* ¶ 40.

67. The SEC concluded in a press release accompanying the SEC Order that "[p]rivate equity fund advisers have a duty to act in the best interest of their clients, but Landress and SLRA helped themselves to millions of dollars' worth of fees to which they had no legitimate claim." *See* "Private Equity Adviser Barred From Industry for Improper Withdrawal From Funds" <https://www.sec.gov/news/pressrelease/2017-42.html> (emphasis added).

68. Because Landress and SLRA made the Offers of Settlement to SEC staff, the SEC Order was final and unappealable when it was issued on February 7, 2017.

### E. Liquid Realty's Management Liability Program

69. Beginning with the Notice of Removal, the Insureds have sought coverage for the various Project Ursula-related matters described above under a "Management Liability" insurance program issued to Liquid Realty Advisors, LLC ("LRA") as the Named Insured for the initial claims-made policy period from July 31, 2013 to July 31, 2014, which was extended by endorsement to July 31, 2015.

70. Twin City issued Universal Excess Simplified Policy No. DB 0231708-13 to LRA providing a maximum limit of liability of $10,000,000 excess of a $10,000,000 in underlying limits. A true and correct copy of the Twin City Policy is attached as Exhibit B.

71. Columbia Casualty Company ("CNA") issued the underlying primary policy, Management Liability Solutions Policy No. 425185778 (the "CNA Primary Policy"), providing a maximum limit of liability of $10,000,000 with a $200,000 self-insured retention. A true and correct copy of the CNA Primary Policy is attached as Exhibit C.

72. The Twin City Policy generally "follows form" to the CNA Primary Policy. This means that the Twin City Policy incorporates by reference all terms, conditions, exclusions and other provisions contained in the CNA Primary Policy unless the Twin City Policy states otherwise.

73. Under the relevant insuring agreement, the CNA Primary Policy obligates the Insurer to pay on behalf of the Insured Entity Loss in connection with Claims first made during the policy period for a Wrongful Act and reported to the Insurer within the policy period or shortly thereafter.

**COMPLAINT FOR DECLARATORY JUDGMENT**

74. "Loss" as defined in the CNA Primary Policy includes Defense Costs for which the Insured is legally obligated to pay on account of a covered Claim.

75. Under the CNA Primary Policy and Twin City Policy, the Insureds not the Insurer have the right and duty to defend Claims.

76. The CNA Primary Policy provides at Section V(D)(3) that the "Insurer shall advance Defense Costs on behalf of the Insureds" subject to the Insureds' undertaking "to repay the Insurer any Defense Costs finally established not to be insured."

77. Section III(G) of the CNA Primary Policy, as amended by Endorsement No. 14, provides that the "Insurer shall not be liable to pay that part of Loss under this policy in connection with any Claim made against the Insured Persons or the Insured Entities":

> Based upon or arising out of:
>
> the gaining of any profit, remuneration or advantage to which the Insured was not legally entitled as determined by a final adjudication in the underlying action or in a separate action or proceeding; or
>
> the committing of any deliberate fraudulent or deliberate criminal act by the Insured as determined by a final adjudication in the underlying action or in a separate action or proceeding.

78. The Twin City Policy follows form to, and thus incorporates by reference, the Profit Exclusion and Fraud Exclusion set forth in Primary Policy Section III(G) (together, the "Conduct Exclusions").

**F. The Insurers Advanced Defense Costs To The Insureds For The Removal Action And SEC Investigation**

79. The Insureds (or their agent) tendered the Notice of Removal to CNA and Twin City before the expiration of the claims-made reporting period set forth in the respective policies.

80. CNA acknowledged the Insureds' tender and agreed to advance Defense Costs incurred in connection with the Notice of Removal subject to a reservation of rights.

81. Twin City likewise acknowledged the Insureds' tender of the Notice of Removal and reserved all of its rights under the Twin City policy in the event of the exhaustion of the CNA Primary Policy.

82. The Insureds (or their agent) later tendered the Counterclaims and the SEC Subpoenas and SEC Investigation to CNA and Twin City for coverage under their respective policies.

83. CNA acknowledged the Insureds' tender and agreed to advance Defense Costs incurred in connection with the Counterclaims and SEC Investigation subject to a reservation of rights.

84. Twin City likewise acknowledged the Insureds' tender of the Counterclaims and SEC Investigation and reserved all of its rights under the Twin City policy should the underlying CNA Policy exhaust.

85. By July 2016, the Insureds' combined Defense Costs for the Notice of Removal, Counterclaims and SEC Investigation exceeded the $10 million limit of liability of the CNA Primary Policy. Consequently, the CNA Primary Policy exhausted.

86. After CNA exhausted, Twin City advanced Defense Costs for the Insureds in the SEC Investigation pursuant to a reservation of rights.

87. Between July 2016 and final resolution of the SEC Investigation, Twin City advanced $2,506,543 in attorneys' fees and expenses associated with the SEC Investigation. Twin City's payments included approximately $450,000 in defense costs incurred prior to the entry of the SEC Order but submitted to Twin City for coverage after the Order had been entered

88. In September 2017, Twin City formally demanded the repayment of all Defense Expenses incurred for the SEC Investigation because coverage was barred by the Conduct Exclusions and the final adjudication in the SEC Order that the Insureds had breached fiduciary duties and "willfully" violated several provisions within the Investment Advisers Act of 1940 (the "Advisers Act") prohibiting fraud and deceit. *See, e.g.,* Advisers Act Section 206(1), 206(2) and 206(4) and C.F.R. 206(4)-8.

89. The Insureds to date have refused to repay Twin City.

/ /

/ /

/ /

**First Cause of Action**

**For Declaratory Judgment that the Factual Findings and**

**<u>Conclusions in the SEC Order Trigger the Conduct Exclusions</u>**

90. Twin City incorporates all preceding allegations as if fully incorporated herein.

91. After the CNA Policy exhausted, Twin City paid over $2.5 million for Defense Costs incurred by the Insureds for the SEC Investigation.

92. The Conduct Exclusions, incorporated by reference into the Twin City Policy, exclude coverage for Loss arising out of (1) the gaining of any profit, remuneration or advantage to which the Insured was not legally entitled, or (2) the committing of any deliberate fraudulent act by the Insured, as determined by a final adjudication in the underlying action or in a separate action or proceeding

93. The SEC Order constitutes a final adjudication in the underlying action within the meaning of the CNA Primary Policy, Section III(G), to which the Twin City policy follows form.

94. The SEC Order finally established that SLRA and Landress gained profit, remuneration or advantage to which they were not legally entitled.

95. In addition, or in the alternative, the SEC Order finally established that SLRA and Landress committed one or more deliberate fraudulent acts.

96. Accordingly, Twin City is entitled to judgment that all Defense Costs previously incurred for the SEC Investigation are not covered under the Twin City Policy and, furthermore, ordering that Twin City should be reimbursed for all previously paid Defense Costs, plus interest.

**Second Cause of Action**

**In the Alternative, For Declaratory Judgment That the Facts**

**<u>Underpinning the SEC Order Finally Establish Applicability of the Conduct Exclusions</u>**

97. Twin City incorporates all preceding allegations as if fully incorporated herein.

98. Under the Twin City Policy, Twin City is entitled to seek a "final adjudication" with respect to the Fraud Exclusion and Profit Exclusion in a separate action.

99. To the extent the SEC Order in itself does not constitute a "final adjudication," Twin City seeks a declaratory judgment from this Court, in the alternative, that the Conduct

-14-
**COMPLAINT FOR DECLARATORY JUDGMENT**

Exclusions in the Twin City Policy bar coverage for the Defense Costs incurred in connection with the SEC Investigation.

100. The SEC Order reflects a clear set of undisputed facts indicating that SLRA and Landress gained profit, remuneration or advantage to which they were not legally entitled within the meaning of the Profit Exclusion.

101. In addition, or in the alternative, the true facts underpinning the SEC Order also support a conclusion in this case that the Insureds committed deliberate fraudulent acts, thereby triggering the Fraud Exclusion.

102. Accordingly, Twin City is entitled to a judgment declaring that Defense Costs incurred for the SEC Investigation are not covered under the Twin City Policy and, furthermore, ordering that Twin City should be reimbursed for all previously paid Defense Costs, plus interest.

**WHEREFORE**, Twin City respectfully requests that this Court:

A. Enter judgment that the Twin City Policy does not provide coverage for the Defense Costs incurred for the SEC Investigation;

B. Enter judgment requiring Defendants to repay all Defense Costs expended for the SEC Investigation totaling over $2,500,000, plus pre- and post-judgment interest;

C. Award Twin City its costs incurred herein; and

D. Award Twin City all other relief to which it may be entitled.

Dated: September 26, 2019                CLYDE & CO US LLP

                                         By: *Kathryn Ashton*
                                         KATHRYN C. ASHTON
                                         W. ANDREW MILLER
                                         DOUGLAS M. MANGEL
                                         GABRIELA RICHEIMER

                                         Attorneys for Plaintiff
                                         TWIN CITY FIRE INSURANCE COMPANY